## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

GRACELYNN L. HOWARD,         )
          )
           Plaintiff,     )       **CIVIL ACTION**
          )
v.                )       **No. 18-2636-KHV**
          )
WALMART, INC.,          )
          )
          Defendant.    )
_____)

### MEMORANDUM AND ORDER

On November 23, 2018, Gracelynn L. Howard sued Walmart, Inc., alleging that defendant discriminated against her based on disability, failed to make reasonable accommodations and retaliated against her for seeking such accommodations and taking medical leave.[1]  Pretrial Order (Doc. #26) filed November 5, 2019.  Plaintiff brings her claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et. seq.  Id.  This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #27) filed December 2, 2019.  For the reasons stated below, the Court sustains defendant's motion in part.

### Factual Background

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to plaintiff.

---

[1]     Plaintiff originally asserted claims for race and age discrimination, which she later withdrew.  Pretrial Order (Doc. #26) at 2.

## I.      Walmart Disciplinary Process

In 2007, plaintiff became a pharmacy manager at defendant's Neighborhood Market in Shawnee, Kansas.   During plaintiff's employment, defendant maintained a policy called "Coaching for Improvement," which detailed levels of disciplinary action.   Under this policy, an employee's first disciplinary event was called a First Writing coaching, and it remained active on the employee's record for 12 months.   If defendant formally disciplined an employee a second time within 12 months of the First Written coaching, the second disciplinary event was called a Second Written coaching.   If defendant formally disciplined an employee a third time within 12 months of the First Written coaching, the third disciplinary event was called a Third Written coaching.   If defendant formally disciplined an employee a fourth time within 12 months of the First Written coaching, the employee was subject to termination.

## II.     First Accommodation Request (Chair)

Since 2014, plaintiff used a chair at work to alleviate back pain.   On November 22, 2016, plaintiff's supervisor, Mike Unruh, instructed her to file a medical accommodation form which documented her need to use the chair.   On January 9, 2017, plaintiff's physician completed her accommodation request form, and plaintiff sent it to defendant the same day.   The form requested that while in the pharmacy, plaintiff be able to use a high back stool or a chair with a back, and that defendant provide automated shutters for the pharmacy windows.   In February of 2017, Caleb Magee replaced Unruh as plaintiff's supervisor.

On February 2, 2017, defendant received plaintiff's request.   On March 13, 2017, defendant granted plaintiff's request for a chair and denied her request for automated shutters, but stated that plaintiff could ask another pharmacy employee or store associate to open and close the

shutters.  On the same day, pursuant to her accommodation request, plaintiff received a chair with a back that satisfied her accommodation needs.

At times, plaintiff asked members of the pharmacy staff or store associates to raise and lower the shutters for her.  At other times, such as when her staff was gone, she had difficulty finding someone in the store to help with the shutters, which forced her to do it herself.

## III.   FMLA Leave Of Absence And First Written Coaching

On June 21, 2017, plaintiff began a leave of absence for surgery to relieve pain in her back and hip.  During plaintiff's leave, Magee put Anne Kaufman Pickens in charge of plaintiff's duties. Pickens told Magee that she had no experience as a manager and did not know what the job entailed.   Pickens received approximately three hours of training for the pharmacy manager position.  While acting as pharmacy manager, Pickens did not receive the credentials necessary to perform all duties required for that position, which left certain tasks for plaintiff to complete when she returned.  Magee testified that Pickens' performance was "below average."

While plaintiff was on leave, Magee asked plaintiff to come into the pharmacy to do the "pharmacist in charge change inventory."[2]  Magee also called and texted plaintiff on multiple occasions to ask when she would return to work.  Plaintiff's coworkers told her that Magee had asked them the same, and that Magee was angry and frustrated that she had not returned.

On September 14, 2017, plaintiff returned to work.  Because defendant had already set work schedules, the pharmacy had an extra pharmacist on duty when plaintiff returned.  Magee instructed plaintiff that for time being, she should let the other pharmacists fill patient prescriptions

---

[2]        The parties do not explain what the "pharmacist in charge change inventory" entails.

while she got up to date on paperwork, training and other managerial duties.  When she returned, plaintiff continued to utilize a chair.

Pickens testified that when plaintiff returned, Magee was hostile toward plaintiff, often "chewed [her] out" and acted like plaintiff should be punished for taking a leave of absence.  Pickens Deposition (Doc. #33-4) filed January 6, 2020 at 9, 18.  According to Pickens, Magee "requir[ed] things from [plaintiff] and [wrote] her up for things that he did not . . . write up other pharmacists for."  Id. at 9.  Moreover, Pickens testified that plaintiff's workload increased when she returned, which was the result of inadequate staffing and defendant's policy change regarding cardboard boxes.[3]  To complete her work, plaintiff had to come in during her days off, and she was at the pharmacy "all the time."  Id. at 11.  Plaintiff testified that when she returned from leave, she received increased oversight and scrutiny from Magee.  Previously, she was left alone to manage the pharmacy.  Within the first week after she returned to work, Magee began issuing particular directives.

On September 29, 2017, Magee gave plaintiff a First Written coaching — her second write-up since she began working for defendant in 2007.  Plaintiff's First Written coaching noted the following performance issues: (1) being late to work three times within a week, (2) failing to timely secure high-level drugs when the pharmacy received them, (3) pharmacy cleanliness, (4) using an improper procedure while preparing immunization paperwork, (5) failing to timely shred sensitive documents, (6) failing to bring the pharmacy up to date on pulling and processing out-of-date or expired prescriptions, (7) failing to count the drugs in the pharmacy every day and (8) a complaint from a patient.

---

[3]     As best the Court can ascertain, defendant implemented a "no cardboard rule," which required the pharmacists to transition their storage into plastic totes.

During plaintiff's meeting with Magee, she disputed the coaching, tried to explain that many of the deficiencies were related to omissions by her staff, and said that she was having trouble getting staff to follow her directions.  Magee did not let plaintiff explain or provide additional information about her alleged wrongdoings, however, and he did not punish anyone besides plaintiff for the alleged failures.  Moreover, Magee instructed plaintiff that from then on, she needed his permission to issue coachings to her staff.  Plaintiff had previously had the authority to manage her staff as she saw appropriate, including issuing coachings.  Magee denied multiple requests by plaintiff to discipline her staff.  On one occasion, Magee denied plaintiff's request to discipline Pickens for tardiness, stating that "sometimes it just falls on your shoulders."  Howard Deposition (Doc. #33-1) at 5.  On another occasion, plaintiff spoke with Magee about a significant number of complaints that she had received about staff pharmacist Seth Ruder's attitude and demeanor toward customers, but Magee insisted "[t]hat's just how Seth is."

In the past, plaintiff had made mistakes similar to those specified in her First Written coaching, but management had not disciplined her for doing so.  With respect to counting the drugs, plaintiff testified that on multiple occasions, she was unable to complete the daily "need to counts" because the pharmacy was too busy or she was short-staffed, and that Magee had never disciplined her for it.  Similarly, management had never disciplined plaintiff for pharmacy cleanliness even though her previous annual reviews mentioned clutter in the pharmacy.

With respect to plaintiff's alleged tardiness, Magee based his allegation on when plaintiff deactivated the alarm.  Plaintiff explained to Magee, however, that she actually arrived at work on time, and that she did not deactivate the alarm until she had completed several tasks that are required prior to deactivation.

**IV.     Second Accommodation Request (Schedule Change)**

Prior to her leave, plaintiff had never worked 12.5-hour shifts on back-to-back days.  When she returned to work in September of 2017, defendant had changed the schedules for all pharmacists, and the new schedules included 12.5-hour shifts on consecutive days.  Plaintiff's schedule had her working 12-hour shifts on consecutive days once every six weeks.  Plaintiff testified that her capacity to work 12.5-hour shifts on consecutive days depended on whether such a back-to-back occurred in combination with four consecutive workdays.  She did not think that she could work on four consecutive days if it included back-to-back 12-hour shifts.

Upon her return, plaintiff asked Magee to change her schedule so that she would not have to work 12.5 hour shifts on as many consecutive days.  Magee denied her request, insisting that the new schedule "is what we're working with."  Howard Deposition (Doc. #33-1) at 26.  From this request until defendant terminated plaintiff's employment, plaintiff worked 12.5 hour shifts on consecutive days once every six weeks.  Each time plaintiff worked 12.5 shifts on back-to-back days, she had worked full days on the preceding two days.

**V.     Second Written Coaching**

For purposes of tracking prescription accuracy, the pharmacy created input reports and plans of action.  The pharmacists who worked the weekend shifts (including plaintiff) were responsible for submitting input reports.  By December 1, 2017, Magee had communicated to plaintiff that he expected the pharmacy to submit input reports by the close of business each Monday, and the input plans of action by each Wednesday.  On February 13, 2018, Magee gave plaintiff a Second Written coaching, which noted that over a six-week period, the pharmacy had failed five times to submit weekly accuracy results and had failed three times to submit weekly plans of action.  During plaintiff's meeting with Magee, she disputed the coaching.  Magee did not

let her explain, however, or provide additional information about her alleged wrongdoings. After the Second Written coaching, Magee denied plaintiff's request to issue coachings to two staff members who had failed to adequately perform their duties, and Magee did not discipline them.

## VI.    Third Written Coaching

Pursuant to pharmaceutical regulations, pharmacists had to complete training to conduct in-store patient finger-prick blood testing, and they had to maintain a pharmacy binder to show that they were certified to do so. Magee required the pharmacists to complete the training and binder by March 8, 2018. By that deadline, Magee had not received any confirmation that plaintiff had completed either. In fact, plaintiff had completed the training, but she did not immediately receive the physical certificate because the link did not work. On March 17, 2018, Magee issued plaintiff her Third Written coaching, which noted that plaintiff had not completed pharmacist training or prepared for point-of-care testing. During plaintiff's meeting with Magee, she disputed the coaching. Again, Magee did not let her explain or provide additional information about her alleged wrongdoings.

## VII.   Termination Of Plaintiff's Employment

As pharmacy manager, plaintiff was responsible for preparing for an annual pharmacy inventory, which a third party would conduct on June 25, 2018. Plaintiff was not scheduled to work from June 22 through June 24, 2018, and she did not tell Ruder (the staff pharmacist on duty) that the annual inventory was scheduled for June 25. On June 24, 2018, Magee arrived at the pharmacy for a pre-inventory walkthrough, and Ruder stated that he did not know about the upcoming inventory. Magee found that pharmaceutical bottles were not properly placed, and pre-count sheets and amber vial reports were not complete.[4] That day, Magee texted plaintiff and ask

---

[4]    "Amber vials" refer to the pill bottles in which the pharmacists put prescriptions.

whether she had gone through the amber vial report.  Plaintiff responded that she could not turn some of the vials back on.[5]  On July 2, 2018, Magee terminated plaintiff's employment for failing to prepare the pharmacy for inventory, which constituted a fourth disciplinary event within 12 months.

On August 14, 2018, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   On November 23, 2018, plaintiff sued Walmart, Inc., alleging that defendant discriminated against her based on disability, failed to make reasonable accommodations and retaliated against her for seeking reasonable accommodations and taking medical leave.  She sues under the ADA and FMLA.

### Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."   Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

---

[5]         Plaintiff testified that "turned back on" means that a prescription had been filled, but returned to stock because the customer had not picked it up.  In these instances, the pharmacist placed a separate label on the amber vial so that it would show up in the vial report for inventory purposes.  If a vial remained on the shelf for a certain amount of time, however, the system did not allow the pharmacist to reenter it — or "turn it back on."   In these cases, plaintiff used a "workaround" by manually writing the price on the amber vials so that the inventory would count the value of those prescriptions.  In the past, plaintiff used that workaround, for which she had never been disciplined.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry their burden, the nonmoving party may not rest on its pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## Analysis

Plaintiff claims that defendant violated the ADA by discriminating against her based on disability, failing to make reasonable accommodations and retaliating against her for requesting such accommodations. Plaintiff also claims that defendant violated the FMLA by retaliating

against her for taking medical leave.  Defendant seeks summary judgment on each of plaintiff's claims.

## I.    ADA Claims

### A.    Exhaustion Of Administrative Remedies

As a threshold matter, defendant asserts that plaintiff cannot base her ADA claims on her First Written coaching because she failed to timely file a discrimination charge for this allegedly adverse employment action.

To recover under the ADA, plaintiff must file a discrimination charge within 300 days of the alleged unlawful employment action.[6]  42 U.S.C. § 2000e-5(e).  Accordingly, plaintiff generally may not sue "based upon claims that were not part of a timely-filed EEOC charge." White v. CertainTeed Corp., No. 17-2262-DDC, 2019 WL 2085671, at *10 (D. Kan. May 13, 2019) (citations omitted).  Under the ADA, each discrete incident of discrimination constitutes its own "unlawful employment action."  Id.  Plaintiff must therefore file an EEOC charge within 300 days of a discrete incident of discrimination in order to preserve her claim based on that incident.  Id.

Under the continuing violation doctrine, however, plaintiff can assert a claim based on incidents which occurred outside of the 300-day window when she "seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act."  Hamer v. City of Trinidad, 924 F.3d 1093, 1098 (10th Cir.), cert. denied sub nom. City of Trinidad, Colo. v. Hamer, 140 S. Ct. 644 (2019) (citations omitted).  In other words, one violation continues when

---

[6]    In states where a state agency has authority to investigate employment discrimination ("deferral states"), the ADA requires claimants to file a charge of discrimination within 300 days of the alleged unlawful employment practice.  Schmidt v. GPI-KS-SB, LLC, No. 13-2381-KHV, 2014 WL 5431157, at *4 (D. Kan. Oct. 27, 2014).  Kansas is a deferral state.

"the conduct as a whole can be considered a single course of conduct." Id.  This contrasts with discrete acts, which are easily identifiable and individually actionable. Croy v. Cobe Labs., Inc., 345 F.3d 1199, 1202 (10th Cir. 2003).  Plaintiff cannot assert claims based on such discrete acts if they fall outside the limitations period, "even if they are related to those occurring within the period." Id.

Here, plaintiff filed her charge of discrimination on August 14, 2018.  Accordingly, she cannot assert ADA claims based on discrete acts which occurred prior to October 18, 2017. Although plaintiff received her First Written coaching on September 29, 2017,  she argues that she can seek relief based on this incident because it does not constitute a discrete action.  According to plaintiff, her First Written coaching "instead was part of [a] pattern of discrimination culminating in Plaintiff's termination," which the Court should evaluate "as though it were a hostile work environment claim." Plaintiff's Opposition To Defendant's Motion For Summary Judgment (Doc. #33) at 50.  In support, plaintiff cites Croy, in which an employee claimed that her employer had established a "glass ceiling" on the advancement of female employees.  Croy, 345 F.3d at 1203.  Even though the employee had not expressly pleaded her claim as such, the Tenth Circuit concluded that it was "more akin to a hostile work environment claim than a discrete act claim" because the employee had alleged that "there was a continuous failure to promote her, which did not involve discrete acts that could or should have triggered any obligation" to file a discrimination charge. Id.

The continuing violation doctrine does not apply to plaintiff's claims.  In the context of the continuing violation doctrine, both the Supreme Court and the Tenth Circuit have expressly addressed the difference between discrete acts and a hostile work environment.  In contrast to discrete acts, which are "easily identifiable and individually actionable," Croy, 345 F.3d at 1203,

a hostile work environment by its "very nature involves repeated conduct," and "cannot be said to occur on any particular day." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). A hostile work environment instead "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id.

Here, plaintiff asserts claims which are based on particular discrete acts — not a general hostile work environment. That is, in contrast to the claims in Croy, plaintiff has not established a continuous unlawful act which transpired over a period of time. Croy, 345 F.3d at 1203 (continuous failure to promote which did not involve discrete acts). She instead bases her claims on four "easily identifiable and individually actionable" discrete acts: three written coachings and the termination of her employment. The first of these discrete acts — her First Written coaching — occurred more than 300 days before she filed her charge of discrimination. Accordingly, plaintiff cannot assert ADA claims based on this discrete act.

This ruling does not preclude the Court from considering the First Written coaching as background in support of plaintiff's timely claims. Nat'l R.R. Passenger Corp., 536 U.S. at 113 (employee can use prior acts as background evidence in support of timely claims).

### B.    Disability Discrimination

Plaintiff claims that defendant discriminated against her based on disability when it issued her Second and Third Written coachings[7] and later terminated her employment. Defendant asserts that as a matter of law, such actions did not constitute discrimination.

The ADA prohibits discrimination based on disability in regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

---

[7]    Plaintiff also claims that defendant discriminated against her when it issued her First Written coaching. As the Court explained above, however, plaintiff's discrimination claim cannot be based on her First Written coaching.

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Absent direct evidence of discrimination, the Court applies the burden-shifting analysis from

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, plaintiff must

first establish a prima facie of discrimination.  E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028,

1038 (10th Cir. 2011).  If she does so, the burden shifts to defendant to articulate a legitimate,

nondiscriminatory reason for its actions.  Id.  If it does so, the burden shifts back to plaintiff to

show that defendant's reasons were merely a pretext for discrimination.  Id.

Here, defendant asserts that as a matter of law, (1) plaintiff has not established a prima

facie case of discrimination, (2) it had legitimate, nondiscriminatory reasons for its actions and

(3) those reasons were not pretextual.

### 1.     Prima Facie Case

Defendant asserts that as a matter of law, plaintiff has not established a prima facie of

discrimination.

Under the ADA, to establish a prima facie of discrimination, plaintiff must show that

(1) she is disabled, (2) she is qualified, with or without reasonable accommodation, to perform the

essential functions of her job and (3) defendant discriminated against her based on that disability.

Id. at 1037–38.  With respect to the third prong, plaintiff establishes discrimination by showing

that she suffered adverse employment action under circumstances which give rise to an inference

that the action was based on disability.  Smothers v. Solvay Chems., Inc., 740 F.3d 530, 544 (10th

Cir. 2014).

Here, defendant challenges the causation element of plaintiff's prima facie case.

Specifically, defendant asserts that plaintiff has not shown that any of its alleged adverse

employment actions (her final two written coachings or her termination) were based on disability.

According to defendant, the record does not contain any evidence that plaintiff's disability caused the adverse employment actions, and the Court cannot infer causation based on temporal proximity because it became aware of plaintiff's disability in February of 2017, but it did not issue the Second Written coaching until February 13, 2018.

The record creates a genuine issue of material fact whether plaintiff's final two coachings and her termination occurred "under circumstances which give rise to an inference" of disability discrimination. Because the record contains other evidence of causation, the fact that defendant committed its first cognizable adverse employment action approximately a year after it discovered plaintiff's disability does not entitle it to judgment as a matter of law. Notably, plaintiff began her medical leave on June 21, 2017, and did not return until September 14, 2017. Thus, plaintiff was not actually at work for approximately three months during this period. Even during her leave, Magee called and texted plaintiff on multiple occasions to ask when she would return to work, and coworkers informed her that Magee was angry and frustrated that she had not returned. When plaintiff did return, Magee met her almost immediately with increased oversight, heavier scrutiny and general hostility. Pickens testified that Magee was hostile toward plaintiff and often "chewed [her] out." Pickens Deposition (Doc. #33-4) at 9. Moreover, prior to her leave, plaintiff was left alone to manage the pharmacy, but within the first week of her return, Magee began issuing specific directives. According to Pickens, Magee "requir[ed] things from [plaintiff] and [wrote] her up for things that he did not . . . write up other pharmacists for." Id. On September 29, 2017 — approximately two weeks after returning — Magee issued plaintiff her First Written coaching. Plaintiff attempted to dispute the allegations and explain that many of the deficiencies were the result of staff ignoring her directions. In response, Magee actually took away plaintiff's authority to discipline her staff, and did not discipline them himself. Defendant then disciplined plaintiff

again on February 13, 2018 (Second Written coaching) and on March 17, 2018 (Third Written coaching), and ultimately fired her on July 2, 2018.

In total, after discovering plaintiff's disability in February of 2017, defendant disciplined her three times until it ultimately fired her on July 2, 2018.  Her only prior discipline came in 2009.  Stated differently, defendant had only disciplined plaintiff once over the course of approximately ten years, but after discovering plaintiff's disability, it did so four times in a little over a year.  This record creates a genuine issue of material fact whether the adverse employment actions at issue (Second and Third Written coachings and termination) occurred "under circumstances which give rise to an inference" of disability discrimination.

### 2.     Nondiscriminatory Reasons

Defendant asserts that as a matter of law, it had legitimate, nondiscriminatory reasons for the adverse employment actions at issue.

As the Court explained above, once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions.  C.R. England, 644 F.3d at 1038.  Here, defendant asserts that plaintiff's coachings and termination were based on a variety of performance issues.  Specifically, (1) as noted in the Second Written coaching, over a six-week period, the pharmacy had failed five times to submit weekly accuracy results and had failed three times to submit weekly plans of action; (2) as noted in the Third Written coaching, plaintiff had not completed pharmacist training or prepared for point-of-care testing; and (3) as noted in her termination documents, plaintiff failed to prepare the pharmacy for inventory inspection.

Plaintiff does not dispute that if true, these are legitimate, nondiscriminatory reasons for the adverse employment actions in question. Defendant has satisfied its burden of production on this issue.

### 3. Pretext

Defendant asserts that as a matter of law, plaintiff has not shown that defendant's legitimate, nondiscriminatory reasons for the adverse employment actions at issue were pretextual. As the Court explained above, once defendant proffers legitimate, nondiscriminatory reasons for its actions, the burden shifts back to plaintiff to show that defendant's reasons are merely a pretext for discrimination. Id. Plaintiff can establish pretext by showing that defendant's proffered reasons for its actions are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [that they are] unworthy of belief." Johnson v. Weld Cty., Colo., 594 F.3d 1202, 1211 (10th Cir. 2010) (citations omitted).

Based largely on the evidence which the Court detailed above, defendant is not entitled to judgment as a matter of law on this issue. Specifically, the evidence shows that Magee began to exhibit his frustration with plaintiff during her medical leave, which began just a few months after defendant discovered her disability. When she returned to work, Magee almost immediately subjected plaintiff to increased oversight and harsher scrutiny until he issued the Second and Third Written coachings and ultimately terminated her employment. In sum, after discovering plaintiff's disability, defendant disciplined her four times in a little over a year, which contrasts starkly with the single discipline that she had received in the prior ten years. Based on this evidence, a reasonable jury could find that defendant's legitimate, nondiscriminatory reasons for its actions (performance issues) were a pretext for disability discrimination. The Court therefore overrules defendant's motion on this issue.

**B.      Failure To Accommodate**

Plaintiff claims that defendant rejected her request for a change in schedule so that she could work fewer consecutive 12.5-hour shifts.[8]  Defendant asserts that it is entitled to summary judgment on plaintiff's claim that it rejected her request for a reasonable accommodation.

Under the ADA, discrimination includes not making reasonable accommodations "to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer shows that "the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A).  To assess a failure to accommodate claim, the Court applies a modified burden-shifting analysis.  Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017).  Under this analysis, plaintiff must first establish a prima facie case by showing that (1) she is disabled under the ADA, (2) she is a qualified individual under the ADA and (3) she requested a plausibly reasonable accommodation and defendant failed to reasonably accommodate her.  Id.  If plaintiff does so, the burden shifts to defendant to either rebut the prima facie case or establish an affirmative defense.  Id.  If it does so, plaintiff must rehabilitate her prima facie case or establish a genuine dispute regarding any affirmative defense.  Id.

Here, defendant asserts that as a matter of law, plaintiff has not established a prima facie case because her request was both insufficient and unreasonable.  Defendant first argues that

---

[8]      Plaintiff concedes that defendant accommodated her request for a chair, and therefore withdraws any failure to accommodate claim based on this request.  Plaintiff's Opposition To Defendant's Motion For Summary Judgment (Doc. #33) at 48 n.4.  Moreover, plaintiff apparently abandons any failure to accommodate claim based on her request for automated shutters in the pharmacy.  In defendant's summary judgment motion, it asserts that it is entitled to judgment as a matter of law on this claim.  In response, plaintiff does not mention this claim, and instead exclusively focuses on her request for a schedule change.  Accordingly, defendant is entitled to summary judgment on this issue.

plaintiff's request for a schedule change was insufficient because she did not expressly delineate her desired schedule or specify how long she would need to maintain that schedule.

This argument is unpersuasive. The ADA imposes on employers a good-faith duty to engage with their employees "in an interactive process to identify a reasonable accommodation." Purewal v. T-Mobile USA, Inc., No. 17-2595-JTM, 2019 WL 4805994, at *9 (D. Kan. Oct. 1, 2019) (citations omitted). This duty begins when a qualified employee informs her employer of a disability and communicates her desire for accommodation. Id. This interactive process "encourages employers and employees to work together to identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." Valdez v. McGill, 462 F. App'x 814, 819 (10th Cir. 2012). An employer who fails to adequately engage in an interactive process "risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance that it will be found to have violated the ADA." Purewal, 2019 WL 4805994, at *9 (citations omitted).

Here, the record reveals a genuine issue of material fact whether defendant engaged in a good-faith interactive process to identify a reasonable accommodation when plaintiff requested an accommodation in her work schedule. Magee immediately rejected plaintiff's request without serious discussion about possible accommodations, stating that her new schedule was "what we're working with." Howard Deposition (Doc. #33-1) at 26. Thus, even if plaintiff's initial request did not contain the particular details which defendant now demands, defendant was apparently uninterested in the particulars of that request when she made it, which eliminated any possibility of finding a feasible solution. Defendant's ADA duty to engage in a good-faith discussion about

accommodations prevents defendant from abruptly rejecting plaintiff's request and then claiming that the request was not specific enough.[9]

Defendant next argues that as a matter of law, plaintiff's request for a schedule change was unreasonable.  Under the ADA, "reasonable accommodation" means:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).  A reasonable accommodation may include job restructuring and part-time or modified work schedules.  42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2).  To determine whether a requested accommodation is reasonable, the Court looks to "the facts of each case, taking into consideration the particular individual's disability and employment position." Punt, 862 F.3d at 1050 (citations omitted).

Here, defendant asserts that plaintiff's schedule change was unreasonable because it was unnecessary.  Specifically, defendant argues that to enjoy the same privileges and benefits of employment as her non-disabled counterparts, plaintiff did not need to change her schedule because she was capable of working the existing schedule (12.5-hour shifts on consecutive days

---

[9]     Defendant dedicates a single sentence in a footnote to the issue of its duty to engage in a good-faith discussion about plaintiff's accommodation request, asserting in conclusory fashion that "no such engagement was necessary because it would have been futile." Defendant's Reply Memorandum In Support Of Motion For Summary Judgment (Doc. #34) filed January 21, 2020 at 21 n.8.  Absent further explanation, the Court cannot address this argument.

once every six weeks).  In support, defendant points to portions of plaintiff's deposition where she states that although not ideal, she could have worked 12.5-hour shifts on consecutive days once every *four weeks*.  Because her existing schedule only required her to work 12.5-hour shifts on consecutive days once every *six weeks*, defendant argues that plaintiff received a better schedule than she actually needed.  In other words, because she was capable of working a more arduous schedule than she actually had at the time, she did not need the requested change.  Accordingly, as a matter of law, her request was unreasonable.

Defendant's argument that it essentially did plaintiff a favor by rejecting her accommodation request is not persuasive, and it does not entitle defendant to judgment as a matter of law.  When plaintiff saw her existing schedule (12.5-hour shifts on consecutive days once every six weeks), she asked defendant to reduce the frequency with which she would have to work 12.5-hour shifts on consecutive days.  As the Court explained above, Magee outright rejected plaintiff's request without further discussion.  In other words, plaintiff did not actually request to work 12.5-hour shifts on consecutive days once every four weeks.  Indeed, that was exactly defendant's grievance above: plaintiff did not provide enough specifics about her request.  Accordingly, contrary to defendant's assertion, plaintiff's request would not have necessarily "*increased* the frequency of such consecutive shifts" — defendant does not know what plaintiff's precise request was because defendant refused to discuss it.   Defendant's Motion For Summary Judgment (Doc. #27) at 28 (emphasis in original).

Defendant also mischaracterizes plaintiff's testimony.  She never testified that regardless of the circumstances, she was capable of working 12.5-hour shifts on consecutive days once every four weeks.  She stated that her capacity to work 12.5-hour shifts on consecutive days depended on whether such a back-to-back occurred in combination with four consecutive workdays.

Specifically, she could not work four consecutive days if it included back-to-back 12-hour shifts. Because Magee rejected her request to change her schedule, this is exactly what plaintiff ultimately had to do: she worked 12.5 hour shifts on consecutive days once every six weeks, and each time she did so, she had worked full days on the preceding two days.  Accordingly, defendant has not shown that as a matter of law, plaintiff did not need the requested change.  As a result, defendant's argument that plaintiff's request was unreasonable collapses.  The record creates a genuine issue of material fact whether plaintiff's requested accommodation was reasonable.  The Court therefore overrules defendant's motion on this issue.[10]

## C.    Retaliation

Plaintiff claims that defendant retaliated against her for requesting a backed chair and a change in her schedule.  She claims that these requests were the reasons that defendant issued her Second and Third coachings and later terminated her employment.  Defendant asserts that it is entitled to summary judgment on plaintiff's claim that it retaliated against her for engaging in protected activity under the ADA.

_____

[10]    In its reply, defendant argues that plaintiff cannot base her claim of failure to accommodate on a request to not work 12.5-hour shifts on consecutive days if such a back-to-back fell within four consecutive days of work.  Defendant argues that plaintiff's *complaint* only alleges that she requested to not work back-to-back 12.5-hour shifts, and that it says nothing about working four days in a row.  The pretrial order — not plaintiff's complaint — measures the dimensions of the lawsuit.  Youren v. Tintic Sch. Dist., 343 F.3d 1296 (10th Cir. 2003); see also Fed. R. Civ. P. 16(d) (pretrial order controls unless court modifies).  The Court liberally construes the pretrial order to "cover any of the legal or factual theories that might be embraced by [its] language." Trujillo v. Uniroyal Corp., 608 F.2d 815, 818 (10th Cir. 1979); see also Cortez v. Wal-Mart Stores, Inc., 460 F.3d 1268, 1276 (10th Cir. 2006) (primary purpose of pretrial order is to avoid surprise by requiring parties to "fully and fairly disclose their views as to what the real issues of the trial will be").

Here, defendant asks the Court to allow plaintiff to base her claim on a request to not work back-to-back 12.5-hour shifts, but to prohibit her from basing her claim on a request to not do so within a four-day work period.  Defendant's hair-splitting runs counter to the liberal construction which the Court applies to pretrial orders.  Defendant cannot argue that it was unduly surprised by this miniature nuance in plaintiff's claims.

The ADA prohibits discrimination against any individual who "has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." White, 2019 WL 2085671, at *13 (quoting 42 U.S.C. § 12203(a)).  If plaintiff relies on circumstantial evidence to prove her ADA retaliation claim, the Court applies the framework from McDonnell Douglas, 411 U.S. 792 (1973).  Id.  Under this framework, plaintiff must first establish a prima facie case of retaliation.  Foster v. Mtn. Coal Co., LLC, 830 F.3d 1178, 1186 (10th Cir. 2016).  If she does so, the burden shifts to defendant to articulate legitimate, nonretaliatory reasons for its actions.  Id.  If it does so, the burden shifts back to plaintiff to show that defendant's proffered reasons were pretextual for retaliation.  Id.

Here, defendant asserts that as a matter of law, (1) plaintiff has not established a prima facie case of retaliation, (2) it had legitimate, nonretaliatory reasons for its actions and (3) those reasons were not pretextual for retaliation.

## 1.    Prima Facie Case

Defendant asserts that as a matter of law, plaintiff has not established a prima facie of retaliation.

To establish a prima facie case of retaliation under the ADA, plaintiff must show that (1) she engaged in a protected activity, (2) she "was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity" and (3) "there was a causal connection between the protected activity and the adverse employment action."  Id.

Here, defendant asserts that plaintiff has not established a causal connection between her accommodation requests and the adverse employment actions at issue.  Specifically, defendant argues that the record does not contain any evidence that plaintiff's requests caused the adverse

employment actions, and that the Court cannot infer causation based on temporal proximity. Defendant points out that it received plaintiff's first accommodation request (for a chair) in February of 2017 and her second accommodation request (for a schedule change) in September of 2017, but it did not take the adverse employment actions at issue until February 13, 2018 (Second Written coaching), March 17, 2018 (Third Written coaching) and July 2, 2018 (termination).

The record creates a genuine issue of material fact whether plaintiff's accommodation requests caused the adverse employment actions at issue.  Like the Court explained above with respect to plaintiff's discrimination claims, the record contains other evidence of causation, so the lack of temporal proximity between plaintiff's accommodation requests and the adverse employment actions does not entitle defendant to judgment as a matter of law.

Defendant received plaintiff's first accommodation request in February of 2017. Beginning on June 21, 2017, she was on medical leave for approximately three months, during which Magee called and texted plaintiff on multiple occasions to ask when she would return to work, and her coworkers informed her that Magee was angry and frustrated that she had not returned.  As the Court explained above, when plaintiff did return, Magee met her almost immediately with increased oversight, heavier scrutiny and general hostility.   On September 29, 2017 — approximately two weeks after returning — Magee issued plaintiff her First Written coaching.  Defendant then disciplined plaintiff again on February 13, 2018 (Second Written coaching) and March 17, 2018 (Third Written coaching), and ultimately fired her on July 2, 2018.

In sum, after receiving plaintiff's accommodation requests in February of 2017 and September of 2017, defendant disciplined her three times until it ultimately fired her on July 2, 2018.  To put defendant's actions into perspective, it had only disciplined plaintiff once

over the course of approximately ten years, but after receiving plaintiff's accommodation requests, it did so four times in a little over a year.  This evidence creates a genuine issue of material fact whether plaintiff's accommodation requests caused the three adverse employment actions at issue.

### 2.      Legitimate, Nonretaliatory Reasons

As the Court explained above, once plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, nonretaliatory reason for its actions. Foster, 830 F.3d at 1186.  Here, defendant asserts that plaintiff's coachings and termination were based on a variety of performance issues.  Specifically, (1) as noted in the Second Written coaching, over a six week period, the pharmacy had failed five times to submit weekly accuracy results and had failed three times to submit weekly plans-of-action; (2) as noted in the Third Written coaching, plaintiff had not completed pharmacist training or prepared for point-of-care testing; and (3) as noted in her termination documents, plaintiff failed to prepare the pharmacy for inventory inspection.

Plaintiff does not dispute that if true, these are legitimate, nonretaliatory reasons for the adverse employment actions in question.  Defendant has satisfied its burden of production on this issue.

### 3.      Pretext

Defendant asserts that as a matter of law, plaintiff has not shown that defendant's legitimate, nonretaliatory reasons for the adverse employment actions at issue were pretextual.  As the Court explained above, once defendant proffers legitimate, nonretaliatory reasons for its actions, the burden shifts back to plaintiff to show that defendant's reasons are merely pretextual for retaliation.  Id.  Plaintiff can establish pretext by showing that defendant's proffered reasons are "so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude the

reason[s] [are] unworthy of belief."  Isom v. Midwest Div.-OPRMC, LLC, No. 13-2602-RDR, 2015 WL 93618, at *6 (D. Kan. Jan. 7, 2015).

Based on the evidence that the Court has detailed above, defendant is not entitled to judgment as a matter of law on this issue.  On this record, a reasonable jury could find that defendant's legitimate, nonretaliatory reasons for its actions (performance issues) were a pretext for retaliation.  Because the record creates a genuine issue of material fact, the Court overrules defendant's motion on this issue.

## II.    FMLA Retaliation Claim

Plaintiff claims that her medical leave from June 21 to September 14, 2017 was the reason defendant issued her First, Second and Third coachings and later terminated her employment.[11] Defendant asserts that it is entitled to summary judgment on plaintiff's claim that it retaliated against her for taking medical leave.

Under the FMLA, an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1318 (10th Cir. 2017) (citing 29 U.S.C. § 2615(a)(2)).  The Tenth Circuit has "construed this provision of the FMLA as creating a retaliation theory of recovery." Id. (citations omitted).  To determine whether defendant retaliated against plaintiff in violation the FMLA, the Court applies the burden-shifting analysis from McDonnell Douglas, 411 U.S. 792 (1973).  Id.  Under this analysis, plaintiff bears the initial burden of establishing a prima facie case of retaliation.  Id.  If she does so, the burden shifts to defendant to offer a legitimate, nonretaliatory

_____

[11]        Unlike with the ADA claims, defendant does not argue that plaintiff cannot base her FMLA claims on the First Written coaching.

reason for its actions.  Id. at 1319.  If it does so, the burden shifts back to plaintiff to show that defendant's proffered reason is pretextual for retaliation.  Id.

Here, defendant asserts that (1) plaintiff has not established a prima facie case of retaliation, (2) it had legitimate, nonretaliatory reasons for its actions and (3) those reasons were not pretextual for retaliation.

### A.    Prima Facie Case

Defendant asserts that as a matter of law, plaintiff has not established a prima facie of retaliation under the FMLA with respect to the Second and Third Written coachings and the termination of her employment.[12]

To establish a prima facie case of retaliation under the FMLA, plaintiff must show that (1) she engaged in protected activity, (2) defendant took an action that a reasonable employee would have found materially adverse and (3) "there exists a causal connection between the protected activity and the adverse action."  Id. at 1318.

Here, defendant asserts that plaintiff has not established a causal connection between her medical leave and the Second and Third Written coachings and the termination of her employment. Specifically, defendant argues that the record does not contain any evidence that plaintiff's leave caused these adverse employment actions, and that the Court cannot infer causation based on temporal proximity.  Defendants points out that plaintiff returned from medical leave on September 14, 2017, and that it did not issue the Second Written coaching until five months later, on February 13, 2018, the Third Written coaching six months later, on March 17, 2018, and it did not terminate her employment until July 2, 2018.

---

[12]    Defendant does not challenge plaintiff's prima facie case with respect to her First Written coaching.

The record creates a genuine issue of material fact whether plaintiff's medical leave caused the adverse employment actions at issue.  On the record evidence, a reasonable jury could find that plaintiff's medical leave caused all four adverse employment actions.

**B.    Legitimate, Nonretaliatory Reasons And Pretext**

Defendant asserts that as a matter of law, it had legitimate, nonretaliatory reasons for its actions and that those reasons were not pretextual for retaliation.  In support, defendant does not offer any further argument, but instead refers the Court to its previous arguments regarding pretext under the ADA retaliation claim.  Because the Court already rejected those arguments, it does not address them again here.  For the reasons above, the record creates a genuine issue of material fact whether defendant's proffered reasons for the adverse employment actions at issue (performance issues) were pretextual for retaliating against plaintiff for taking medical leave.  The Court therefore overrules defendant's motion on this issue.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #27) filed December 2, 2019 is **SUSTAINED in part.**  The Court grants defendant judgment as a matter of law on plaintiff's ADA claims which are based on her First Written coaching, and her failure to accommodate claims which are based on her request for a chair and automatic shutters.  The Court overrules defendant's motion on all other issues.

Dated this 23rd day of April, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge